IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Dennis Temple, | ) | |
| | ) | Civil Action No. 6:13-144-JFA-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Oconee County; Sheriff James | ) | |
| Singleton; Major Steve Pruitt; | ) | |
| Lieutenant Unknown Fostervold; | ) | |
| Sergeant Dallas Shirley; Officer Robert | ) | |
| Whitfield; Officer David Wald; Officer | ) | |
| Wayne Hill; Officer Tim Williamson; | ) | |
| Officer Ray Armstrong; Officer Joy | ) | |
| Hunter; Officer Scott Arnold; Sergeant | ) | |
| Kevin Cain; Lieutenant Greg Reed; | ) | |
| Officer Travis Overton; Officer Beverly | ) | |
| Siegler; Officer Cindy Beckett; Sergeant | ) | |
| Roger Foster; Sergeant Brenda Wallis; | ) | |
| Sergeant Renita Rohletter; Officer | ) | |
| Lori McAllister; Officer Rudy Steele; | ) | |
| Officer Zachary Lombardi; Officer Lisa | ) | |
| Herbert; Officer Lindsey McKinney; | ) | |
| Officer Jason Addis; Officer Gene | ) | |
| Evans; Officer Rick Oakley; Officer | ) | |
| Jonathon Jerde; Officer John Charles; | ) | |
| Officer Maria Melendez; Officer Denise | ) | |
| Chasteen; Officer Tyrone Merck; | ) | |
| and Officer Patrina Blassingame, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on the defendants' motion for summary judgment. The plaintiff, a state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(d) DSC, this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the district court.

On November 27, 2013, the defendants filed a motion for summary judgment (doc. 85). On December 2, 2013, pursuant to *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), the plaintiff was advised of summary judgment procedure and the possible consequences if he failed to respond adequately. The plaintiff filed his response (doc. 91) on December 23, 2013.

## FACTS PRESENTED

In May 2010 the plaintiff was arrested by Sergeant Jerry Moss of the Oconee County Sheriff's Office and charged with kidnapping, first-degree criminal sexual conduct, and grand larceny. The plaintiff was incarcerated at the Oconee County Detention Center ("OCDC") from May 2010 until December 16, 2010. On December 15, 2010, the plaintiff was convicted on all charges and sentenced to 100 years in prison (doc. 1 ¶¶ 182–83). An exhibit appended by the plaintiff to his response to the motion for summary judgment indicates that the criminal case arose out of the kidnapping and sexual assault of a nineteen-year-old female Clemson University student at a self-storage facility in Seneca, South Carolina, in May 2010 (doc. 91-3 at 7). The plaintiff is currently incarcerated at Lieber Correctional Institution in the South Carolina Department of Corrections ("SCDC").

The plaintiff alleges that during his pretrial detention at OCDC his constitutional rights were violated. Specifically, he alleges causes of action for: (1) conspiracy under 42 U.S.C. § 1985 and § 1986; (2) placing him in administrative segregation for possession of legal books in violation of the First and Sixth Amendments; (3) denial of due process and equal protection in violation of the Fourteenth Amendment; (4) policy prohibiting detainees from sharing legal materials and knowledge of the legal system in violation of the First and Sixth Amendments; (5) First Amendment restriction of reading materials and denial of access to the courts; (6) policy forcing detainees to talk with law enforcement officials in violation of the Sixth Amendment; and (7) cruel and unusual punishment in violation of the Eighth Amendment (*see generally* doc. 1).

2

### Conspiracy

In count one of his complaint entitled "Conspiracy policy," the plaintiff alleges that he made several requests for legal materials and that legal materials were required to be donated or to be provided from an outside source (doc. 1 at 15-16). The plaintiff was provided legal materials by Sergeant Shirley during the time he was incarcerated at OCDC (doc. 85-9 at 92–94). Defendant Shirley states that the plaintiff was not required to donate books or other legal materials to receive them (doc. 85-6, Shirley aff. ¶ 5). The plaintiff does not allege any other justification for his conspiracy claim in his complaint.

To the extent the plaintiff's complaint could be construed to allege a civil conspiracy claim under Section 1983, this claim fails. To establish a civil conspiracy under Section 1983, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the [plaintiff's] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)). To meet the "weighty burden to establish a civil rights conspiracy[,]". . . . "[the plaintiff] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* Thus, the "evidence must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* Generalized allegations of conspiracy are insufficient to support a claim of conspiracy under Section 1983. *Stubbs v. Hunter*, 806 F. Supp. 81, 82–83 (D.S.C. 1992).

The plaintiff has not pled sufficient facts to pursue an action under 42 U.S.C. § 1985(3) or under 42 U.S.C. § 1986. A plaintiff raising a claim pursuant to 42 U.S.C. § 1985(3) must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of conspiracy; (4) whereby a person is either injured in his or her person or property or deprived of any right or privilege of a citizen of the United States. *See Trerice v. Summons*, 755 F.2d 1081, 1085

(4th Cir.1985).  Section 1986 makes actionable the failure to prevent any of the wrongs set forth in Section 1985.  *See* 42 U.S.C. § 1986.  Therefore, a claim under Section 1986 is dependent on the existence of a valid Section 1985 claim. *See Trerice*, 755 F.2d at 1085. Also, generalized allegations of conspiracy are not sufficient to state a claim under Section 1985.  *See Patterson v. Goudelock*, Civil Action No. 3:10-3019-MBS-BM, 2010 WL 6986140, at *3 (D.S.C. Dec. 16, 2010), *adopted by* 2011 WL 2672566 (D.S.C. June 30, 2011).

### Administrative Segregation

In count two of his complaint, the plaintiff claims that OCDC has a policy of placing detainees in segregation in retaliation for having legal books (doc. 1 at 18-19).  The plaintiff's placement or classification is not actionable.  The act of placing a detainee or prisoner in administrative segregation or higher custody is not punitive *per se* because it is rationally connected to legitimate governmental objectives.  Courts have recognized that administrative separation or segregation may, for example, serve any number of the following legitimate interests—to protect an inmate's safety, to protect other inmates from a particular inmate, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. *Merriweather v. Reynolds*, 586 F. Supp. 2d 248, 557–58 (D.S.C. 2008); *see also McKune v. Lile*, 536 U.S. 24, 26 (2002) (noting that the "decision where to house inmates is at the core of prison administrators' expertise"); *cf. Keeler v. Pea*, 782 F. Supp. 42, 43–44 (D.S.C. 1992) (South Carolina law confers no protected liberty interest upon inmates of the SCDC from being classified, or being placed in administrative segregation, in a particular prison, or in a particular section of a prison).

The plaintiff's placement in administrative segregation was directly related to his behavior and was not done for possessing legal books or materials (doc. 85-8, Pruitt aff. ¶ 23; Shirley aff. ¶ 4; *see also* doc. 85-7, Shirley aff. ex. B).  During his time at OCDC, the plaintiff failed to follow the rules of the facility and was a disruptive force (*see generally* Pruitt aff. ex. A-T).  The plaintiff had conflicts with other detainees or inmates, made threatening comments to officers, threatened other detainees and officers, destroyed

4

Detention Center property and threw feces and urine from his cell on numerous occasions. In an effort to gain the plaintiff's compliance with the facility rules, Director Pruitt entered into two Inmate Agreements with the plaintiff (Pruitt aff. ¶¶ 20-22; doc. 85-9, Pruitt aff. ex. R and S). The plaintiff failed to abide by either of the Inmate Agreements (Pruitt aff. ¶¶ 20, 22).

### Policy Prohibiting Sharing of Legal Materials and Knowledge

In count four of his complaint, the plaintiff alleges that he was warned not to share legal material and knowledge of the legal system as a "jailhouse lawyer," which violated his rights under the First and Sixth Amendments (doc. 1 at 2, 21). The plaintiff was not placed in administrative segregation for possession of legal materials. Moreover, the plaintiff has no right under the Sixth Amendment, First Amendment, Fourteenth Amendment, Equal Protection or Due Process Clauses to share legal materials or legal knowledge with other inmates or detainees. *Plyler v. Leeke*, Civil Action No. 3:82-876-2, 1986 WL 84459, at *56 (D.S.C. Mar. 26, 1986) ("Inmates Buchanan and Williams, both of whom have tried in the past to be 'jailhouse lawyers,' may have misconstrued judicial tolerance of writwriting in the past as a license for them to serve as lay advocates. No such license exists, as you know. Buchanan cannot represent others in this case."). Accordingly, the plaintiff has failed to state a claim in this regard. *See Hummer v. Dalton*, 657 F.2d 621, 625–26 (4th Cir. 1981) (a prisoner cannot act as a "knight-errant" for other prisoners); and *Plummer v. Riley*, C.A. No. 2:12-3412-TLW-BHH, 2014 WL 1277903, at *12 (D.S.C. Feb. 26, 2014) ("a jailhouse lawyer does not have a protected interest in providing legal representation to other inmates"), *adopted by* 2014 WL 1277897 (D.S.C. Mar. 27, 2014).

### Access to Courts

In count five, the plaintiff alleges that he has been denied access to the courts (doc. 1 at 22). The United States Constitution guarantees the right of meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817 (1977). That access must be "adequate, effective and meaningful." *Id.* at 822. *Bounds* "did not create an abstract, free standing

5

rightto a law library or legal assistance." *Lewis v. Casey*, 518 U.S. 343 (1996). In order to state a claim for denial of access to the courts, a prisoner must provide some basis for his allegation that he has been deprived of meaningful access to the courts. *White v. White*, 886 F.2d 721, 723 (4th Cir. 1989).

In addition, a plaintiff must show actual injury resulting from the alleged denial of access. *Lewis*, 518 U.S. at 349. The plaintiff must identify with specificity the actual injury resulting from the defendants' conduct. *Cochran v. Morris*, 73 F.3d 1310, 1316-17 (4th Cir. 1996). The "'actual injury' that an inmate must demonstrate is that the alleged shortcomings in the prison library or legal assistant program have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim." *Lewis*, 518 U.S. at 343; *see also Michau v. Charleston Cnty., S.C.*, 434 F.3d 725, 728 (4th Cir. 2006) (in access to court claim, inmate must allege and show that he or she has suffered an actual injury or specific harm to his litigation efforts as a result of the defendant's actions).

As noted above, the plaintiff asserts he was placed in administrative segregation as a result of possessing legal materials. The defendants have submitted affidavits of former Sergeant Dallas Shirley and Director Steve Pruitt in support of the their motion for summary judgment. From April 30, 2010, through December 16, 2010, the plaintiff was provided with over 70 cases and 15 statutes (Pruitt aff. ¶ 24; Shirley aff. ¶ 2). Numerous requests were also faxed to the Solicitor's Office and several attorneys representing the plaintiff at the plaintiff's request (Shirley aff. ¶ 2; Pruitt aff. ¶ 24). Copies of the Request to Staff forms showing the date the documents were faxed are attached to Director Pruitt's affidavit (Pruitt aff. ex. T). Sergeant Shirley was the person designated to supply the plaintiff with legal materials (Shirley aff. ¶ 3; Pruitt aff. ¶ 23; *see also* Shirley aff. ex. A-HH). The plaintiff's requests for copies of cases, statutes, and other legal materials were responded to on the same day or within a few days (Shirley aff.¶ 37). Accordingly, summary judgment should be granted as to this claim.

6

***Magazines and Newspaper Policy***

In count five, the plaintiff also complains of not being allowed to have magazines and newspapers (doc. 1 at 23-24). It is well settled that the Constitution allows greater restriction of First Amendment rights in a prison setting. *See Beard v. Banks*, 548 U.S. 521, 528 (2006), *Turner v. Safely*, 482 U.S. 78, 84–85 (1987); and *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). ("Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration."). Courts accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132; *Pell v. Procunier*, 417 U.S. 817, 826–27 (1974).

In *Turner*, four factors are set forth to determine whether a prison regulation is reasonable: (1) the existence of "a 'valid, rational connection' between the prison regulation and legitimate governmental interest put forth to justify it": (2) "whether there are alternative means of exercising the rights that remain open to prison inmates": (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally'" and, (4) "the absence of ready alternatives." *Turner*, 482 U.S. at 89–90.

The plaintiff asserts that he was not allowed to have newspapers and magazines in the OCDC. The plaintiff also alleges that books from outside publishers are not allowed unless donated to the OCDC (doc. 1 at 23). The defendants acknowledge that newspapers and magazines are not allowed in the facility because they cause clutter, would require more supervision by officers, and constitute a fire hazard. Detainees do have access to books from the library (Pruitt aff. ¶ 25). Sergeant Shirley advised the plaintiff that legal books are not required to be donated during a discussion and a response to an Inmate Request to Staff dated June 20, 2010 (Shirley aff. ¶ 5). The only restricted materials were newspapers and magazines. There is a rational connection between this restriction and the

7

legitimate governmental interest of institutional safety and security. The facility has provided alternative means of exercising the right to legal materials through books provided in the institutional law library.

This court has upheld prison policies prohibiting newspapers and magazines in certain sections of prisons. *See*, *e.g.*, *Scott v. Miro*, C.A. No. 0:11-cv-03169-RBH, 2014 WL 799099, at *2 (D.S.C. Feb. 27, 2014) (collecting District of South Carolina cases and upholding SCDC Policy OP–22.12), where the Honorable R. Bryan Harwell, United States District Judge, noted:

> The policy creates an incentive or motivation for inmates placed in SMU to change their behavior to either obtain release from SMU or to avoid placement in SMU. The policy also places limitations on the amount of reading material to promote and maintain order and discipline. Limiting the number of books and periodicals reduces a potential fire hazard in the SMU. Limiting the number of books and periodicals reduces clutter and thus an SMU inmate has less places to hide drugs and weapons. In addition, the policy deters improper uses of paper available from books, newspapers and magazines. Inmates use paper from books, magazines, and newspapers to cover cell windows to conceal activity within their cell, jam the locks to prevent entry into their cell, and stop up toilets.

*Scott*, 2014 WL 799099, at *3 (quoting *Koon v. Ozmint*, C.A. No. 8:06-2000-RBH, 2007 WL 1486067, at *4 (D.S.C. May 18, 2007)).

In light of the plaintiff's documented misbehavior, the restrictions on magazines and newspapers at OCDC are reasonable. In *Beard v. Banks*, 548 U.S. 521 (2006), the Supreme Court addressed a challenge to a prison policy denying newspapers, magazines, and photographs to "a group of specially dangerous and recalcitrant inmates" who were in a prison's long term segregation unit. The Court held that the prison's stated rationale of motivating better behavior and discouraging other inmates satisfied the four factors set forth in *Turner*. 548 U.S. at 531–32. The Supreme Court in *Beard* specifically found the third factor of the *Turner* test is satisfied when magazines and publications are restricted because correctional officials would otherwise not have this method of rewarding good behavior and for punishing inappropriate behavior. *Id.* at 532–33.

8

Moreover, other cases in this district have found that the restrictions on magazines and newspapers magazines do not violate an inmate's First Amendment rights. *See*, *e.g.*, *Williams v. Ozmint*, C.A. No. 6:07-2409-DCN-WMC, 2008 WL 4372986, at *5 (D.S.C. Sept. 22, 2008), *aff 'd*, No. 08-8228, 351 F. App'x 825 (4th Cir. Nov. 13, 2009); *Wiles v. Ozmint*, C.A. No. 0:05-2111-CMC-BM, 2006 WL 2260136, at *1 n.2 (D.S.C. Aug. 7, 2006) ("While Plaintiff believes the MSU policies relating to his possession of books, magazines or other 'outside' literature, and photographs violate his First Amendment rights, his stated disagreements with the policies do not show the policies in question are not 'reasonably related to legitimate penological interests.'"); and *Ray v. Metts*, C.A. No. 4:04-23048-TLW-TER, 2009 WL 2983008, at *6 (D.S.C. Sept. 14, 2009) ("The policy regarding newspapers and the second class mail items was formulated to reduce the risk of fire hazard associated with an accumulation of newspapers in the mail room and in the inmate's cell."), *aff'd*, No. 09-7759, 376 F. App'x. 355 (4th Cir. May 3, 2010) (involving a county detention center in South Carolina).

The Due Process Clause of the Fourteenth Amendment prohibits a deprivation of property without due process of law. *Dusenbery v. United States,* 534 US 161, 167 (2002). The plaintiff's claimed interest must fall within "life, liberty or property." *Hewitt v. Helms*, 459 US 460, 466 (1983). In order to create a liberty interest, a regulation must contain "'explicitly mandatory language,' *i.e.*, specific directives to the decision maker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dep't of Corr. v. Thompson*, 490 US 454, 463 (1989). Here, there is no regulation with mandatory language that requires a certain decision in a certain circumstance. There is no state created liberty interest in newspapers, magazines, or other published materials claimed by the plaintiff. The plaintiff cannot show any interest in "life, liberty or property" and cannot state a due process violation in this case.

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." In order to succeed on an equal protection claim, the plaintiff must show that he has been treated differently from others similarly situated and that the treatment was caused by intentional discrimination. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); and *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). The discrimination must only be rationally related to a legitimate state interest. *Waters v. Bass*, 304 F. Supp. 2d 802, 810 (E.D. Va. 2004). The plaintiff has not been subjected to an Equal Protection violation because the policy of OCDC with respect to newspapers and magazines applies to all inmates or detainees at the facility.

Based upon the foregoing, summary judgment should be granted on this claim.

### Policy Forcing Detainees to Talk to Law Enforcement

In counts six and ten of his complaint, the plaintiff alleges that the defendants had a policy of forcing detainees to talk with law enforcement officials in violation of the Sixth Amendment (doc. 1 at 26-27, 38-39). The defendants have submitted the affidavits of Captain Greg Reed, Investigator Scott Arnold, and Detention Officer Gene Evans in support of their motion for summary judgment. Defendant Reed is the Captain over investigations with the Oconee County Sheriff's Office (doc. 85-4, Reed aff. ¶ 1). Reed spoke with the plaintiff's brother and asked that he get the plaintiff to turn himself in (*id.* ¶ 2). As a result, the plaintiff "turned himself in" to Sergeant Jerry Moss at the OCDC (*id.* ¶ 2). The plaintiff requested an attorney and was not interviewed again about that matter (*id.* ¶ 3).

Following the plaintiff's trial, defendant Reed again spoke with the plaintiff about another crime (*id.* ¶ 3). The plaintiff was not forced to go anywhere to talk with Reed or other law enforcement officials (*id.* ¶ 4). On or about December 16, 2010, defendant

10

Reed spoke with the plaintiff, after his conviction, about a murder he was investigating (*id.* ¶ 5). The plaintiff voluntarily spoke with defendant Reed and was advised by Reed that he was the prime suspect in that murder investigation (*id.*). The plaintiff would not talk about the murder investigation, which ended the interview (*id.* ¶ 6).

In his affidavit, Officer Gene Evans states that he was a Detention Officer in June 2010 when the plaintiff was incarcerated at OCDC (doc. 85-4, Evans aff. ¶ 1). The practice of the facility is to advise inmates and detainees when someone wishes to see them, but inmates or detainees are not required to speak with anyone, even law enforcement officials (*id.* ¶ 2). Officer Evans denies telling the plaintiff on any occasion that he had no choice but to speak with law enforcement and denies blocking the plaintiff's path or closing the gate to require the plaintiff to speak with law enforcement (*id.* ¶ 3). The plaintiff was not forced upstairs by Officer Evans or anyone else on that date (*id.* ¶ 3).

Officer Scott Arnold is an Investigator with the Oconee County Sheriff's Office (doc. 85-5, Arnold aff. ¶ 1). Officer Arnold denies speaking with the plaintiff on June 22, 2010, or any other time in June 2010 because the plaintiff was represented at that time (*id.* ¶ 2). Officer Arnold denies that he or anyone else with the Sheriff's Office or the Detention Center forced the plaintiff upstairs or anywhere else (*id.* ¶ 3).

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Under the holding in *Miranda*, an uncounseled statement made by a defendant during custodial interrogation should be suppressed from use by the government in its case-in-chief unless the prosecution proves that the suspect voluntarily waived his or her right to counsel and privilege against self-incrimination. *Id.*

11

Law enforcement officials are required to adhere to the *Miranda* procedures only when engaged in a "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012). In the case at bar, the plaintiff was already in OCDC when he was interviewed by law enforcement officers with respect to an unrelated murder investigation.  In *Howes*, a prisoner, while serving a sentence in a Michigan jail, was escorted by a correctional officer to a conference room, where two armed sheriff's deputies questioned him about allegations that, prior to his incarceration, he engaged in sexual conduct with a twelve-year-old boy. In *Howes*, the Supreme Court held that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Id*. at 1190.  The Supreme Court in *Howes* concluded that the risks of coercion underlying the *Miranda* decision are not necessarily present for prisoners because a prisoner likely faces less "shock" in being questioned than a free individual who may have been arrested; a prisoner "is unlikely to be lured into speaking by a longing for prompt release"; and a prisoner "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id*. at 1190–91.  Hence, the Supreme Court in *Howes* held that a prisoner already in prison was not "in custody" under *Miranda*. *Id*. at 1192–93.  In other words, *Miranda* rights are not triggered simply because a person is incarcerated in a jail or prison. *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) ("We have never decided whether incarceration constitutes custody for *Miranda* purposes, and have indeed explicitly declined to address the issue.").  The Supreme Court in *Howes* also held that questioning a prisoner in private or about events that took place outside of the prison is also insufficient to render the prisoner "in custody" for purposes of *Miranda*. *Howes*, 132 S.Ct. at 1191.  The Supreme Court indicated that, unlike a free individual, isolating a prisoner generally does not deprive him of a "supportive environment," and security precautions taken to isolate the prisoner,

12

such as an armed guard for transport, are an "ordinary and familiar attribute of life behind bars." *Id*. at 1192.  The Court also found it insignificant that a prisoner is unable to leave an interrogation conference room on his own and has to wait for a guard to escort him back to his cell after the interrogation concludes because such restrictions would be imposed regardless of the interrogation. *Id*. at 1193–94.

Therefore, under *Howes*, the plaintiff was not "in custody" for *Miranda* purposes.  With respect to the May 2010 questioning on the day the plaintiff turned himself in with respect to his criminal charges, the alleged questioning ceased after the plaintiff requested an attorney (Reed aff. ¶ 3), as required by *Miranda*, 384 U.S. at 474.  Moreover, since the post-trial questioning about the murder investigation on December 16, 2010, ended after the plaintiff told defendant Reed that he (plaintiff) would not talk about it (Reed aff. ¶ 6), there was no *Miranda* violation. *See Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

Based upon the foregoing, summary judgment should be granted on this claim.

### Eighth Amendment Claims

In count nine of his complaint, the plaintiff alleges cruel and unusual punishment in violation of his Eight Amendment rights (doc.1 at 33-37).  Since the plaintiff was a pretrial detainee during most of the relevant time in this case, his claims are evaluated under the Fourteenth Amendment, not the Eighth Amendment.  Under *Bell v. Wolfish*, a pretrial detainee faces a lighter burden to show a constitutional violation than under the Eighth Amendment.  441 U.S. 520,  537 n.16 (1979) (due process requires that a pretrial detainee not be punished; the Eighth Amendment requires that the punishment imposed not be cruel and unusual).  But, as a practical matter, courts do not distinguish between the Eighth and Fourteenth Amendments in the context of a pretrial detainee's

Section 1983 claim. *See Hill v. Nicodemus*, 979 F.2d 987, 990–92 (4th Cir. 1992); and *Belcher v. Oliver*, 898 F.2d 32, 33 (4th Cir. 1990).

"[N]ot every hardship encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Hill v. Nicodemus*, 979 F.2d at 991, which cites *Bell*, 441 U.S. at 537. To establish that a condition or restriction of confinement is constitutionally impermissible "punishment," a pretrial detainee must show "either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Bell*, 441 U.S. at 538-40. Courts may infer that a restriction or condition is not reasonably related to a legitimate governmental objective, and is therefore punishment, if the restriction is arbitrary or purposeless. *Id.* at 539. While the purpose of pretrial confinement is to insure the detainee's presence at trial, the detention center may impose restraints on the detainee that are reasonably related to the detention center's interest in maintaining the facility's security, even if the restraints "are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Id.* at 539–40.

The plaintiff's classification and custody level within the OCDC do not support a cognizable federal constitutional claim. *See Olim v. Wakinekona*, 461 U.S. 238, 246–50 (1983); and *Ange v. Paderick*, 521 F.2d 1066, 1068 (4th Cir. 1975). In other words, the placement and assignment of inmates into particular institutions or units by state or federal corrections departments or detention centers are discretionary functions and are not subject to review *unless* state or federal law places limitations on official discretion. *See Hayes v. Thompson*, 726 F.2d 1015, 1016–17 & n.1 (4th Cir. 1984) (collecting cases); and *Phomphackdi v. Spartanburg Cnty.*, C.A. No. 9:05-3084-DCN-GCK, 2006 WL 4391127, at *8–9 (D.S.C. Nov. 20, 2006) (addressing a pretrial detainee's claim that being placed in administrative segregation for a period of eight months violated his rights and concluding

14

that "[t]his type of confinement does not implicate any due process rights"), *adopted by* 2007 WL 858736 (D.S.C. Mar. 20, 2007).

The plaintiff's allegations do not rise to the level of a Fourteenth Amendment violation as he has failed to show any serious or significant physical or emotional injury resulting from the alleged conditions and has further failed to show that the defendants acted with a sufficiently culpable state of mind. *See Thompson v. Brown*, C.A. No. 3:11-318-TMC-JRM, 2011 WL 6012592, at *1–2 (D.S.C. Nov. 8, 2011) (rejecting conditions of confinement claim where the plaintiff claimed "his mattress and blanket were confiscated for six days, he was not allowed to have any toilet tissue for six days, his clothes were taken away from him for six days, his cell was cold, he had no running water in his cell, and he was forced to sleep on a steel cot for six days"), *adopted by* 2011 WL 6012550 (D.S.C. Dec. 2, 2011).

In fact, in his response to the motion for summary judgment, the plaintiff indicates that he was taken to the isolation cell at OCDC on July 7, 2010, after an incident where another detainee named Sarge and his (Sarge's) "gang" started throwing watermelon, water, trays, and cups at the plaintiff (doc. 91 at 24–25). Courts have recognized that administrative separation or segregation may, for example, serve any number of the following legitimate interests—to protect an inmate's safety, to protect other inmates from a particular inmate, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. *Merriweather*, 586 F. Supp. 2d at 557–58. By moving the plaintiff to the isolation unit, the defendants were protecting the plaintiff from potential violence from other detainees, as required by cases such as *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (prison officials have duty to protect prisoners from violence "at the hands of other prisoners"), and *Miltier v. Beorn*, 896 F.2d 848, 851–52 (4th Cir. 1990).

The plaintiff also acknowledges that in November 2010, after he was informed that he would not get a thicker sleeping "mat," he intentionally flooded his cell and threw

15

waste outside into the hallway (doc. 91 at 29–30). Although the plaintiff in his response states that he "was provoked into flooding the cell" (*id.* at 31), there is no constitutional right for inmates or detainees to flood their prison or jail cells. *See Harper v. McLeod*, Civil Action No. 2:12-cv-00656, 2014 WL 1159129, at *11, 17 (S.D.W.Va. Mar. 21, 2014) (when an inmate floods cell, floors become slick, water can flow to lower floors of facility, can pose a biohazard, and can damage plumbing system and governmental property). Hence, the turning off of the water to the plaintiff's cell and the addition (by welding) of "extra pieces of steel" to keep the plaintiff from throwing out waste outside his cell (doc. 91 at 31) were a legitimate response to the plaintiff's misbehavior. *See Wolff v. McDonnell*, 418 U.S. 539, 558–62 (1974) (federal courts must accord great consideration to an institution's need to maintain order, discipline, and control). Also, as noted earlier in this Report and Recommendation, detention center officials, under *Beard v. Banks*, are allowed to have methods of rewarding good behavior and for punishing inappropriate behavior. 548 U.S. at 532–33. In fact, the plaintiff's complaint indicates that, after he apprised defendant Patrina that he "would stop throwing shit out the cell," the plaintiff's "visits and food trays were restored to normal, and he was allowed to purchase canteen" (doc. 1 ¶¶ 178–79).

The plaintiff has not alleged, nor can he prove, the deprivation of a basic human need, as required by cases such as *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). The plaintiff has not alleged any conditions with any specificity that he claims violate the Eighth or Fourteenth Amendments. The plaintiff admits to throwing feces and urine into the hallway (Pruitt aff. ¶ 12-19 & ex. J-Q). The plaintiff had previously threatened to throw feces to get what he wanted (Pruitt aff. ¶ 11 & ex. I).

Assuming *arguendo* that the plaintiff has shown a sufficiently serious deprivation of care, the subjective component requires that the plaintiff allege facts showing that detention center officials acted with a deliberate indifference. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). The plaintiff cannot show that the defendants acted with

deliberate indifference. *See Farmer*, 511 U.S. at 847. To the contrary, the defendants entered into two Inmate Agreements with the plaintiff in an attempt to gain the plaintiff's compliance with the rules of the facility. Accordingly, the undersigned recommends granting summary judgment on the plaintiff's conditions of confinement claims.[1]

### Legal Materials

In counts one through five of his complaint, the plaintiff alleges the defendants denied him legal materials. The United States Court of Appeals for the Fourth Circuit has ruled that the Constitution of the United States does not require every local jail to have a law library. *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987). The holding in *Magee v. Waters* is based on the knowledge that county jails are generally short-term facilities, wherein "'the brevity of confinement does not permit sufficient time for prisoners to petition the courts.'" *Magee v. Waters*, 810 F.2d at 452, citing *Cruz v. Hauck*, 515 F.2d 322, 331–33 (5th Cir. 1975). In *Cruz*, the court noted: "access to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate device of *the State*." 515 F.2d at 331 (emphasis added).

Information disclosed by the plaintiff indicates that he decided to appear *pro se* in his criminal case. Where a defendant elects to proceed *pro se* in a pending criminal case, he or she is not entitled to legal materials. *See Jones v. Lexington Cnty. Det. Ctr.*, 586 F. Supp. 2d 444, 448 n. 2 (D.S.C. 2008) ("[T]o the extent Plaintiff is saying his lack of access to legal materials is related to the criminal matter for which he has been incarcerated, this claim fails as a matter of law, as the state is only required to provide criminal defendants legal counsel, not legal research materials.").

---

[1] In his response to the motion for summary judgment, the plaintiff also alleges that on or about November 4, 2010, after he flooded his cell, the defendants started feeding him "some type of grounded up nasty meat substance on bread and an apple a day" (doc. 91 at 30). As this allegation was not included in the complaint, it is not properly before the court and will not be further addressed here.

Moreover, the plaintiff has not alleged a specific injury from his lack of access to law books. *See Magee*, 810 F.2d at 452 (prisoner must show specific injury or actual harm from absence of law library when that prisoner was housed only temporarily in a local jail); and *Tinsley v. Singleton*, C.A. No. 8:08-532-SB, 2009 WL 764877, at *8 (D.S.C. Mar. 23, 2009) ("Moreover, to the extent that the Plaintiff challenges his inability to file other actions while he was being held, he does not identify any actions he wished to file, point to any specific issue he wished to research, or allege any specific injury he suffered other than his proceeding at trial without counsel and without research materials.").

The obligation to provide legal assistance to the plaintiff rested with the State of South Carolina, not with the named defendants in this case. *United States v. Chatman*, 584 F.2d at 1360 ("Thus, to the extent that it may be said that *Bounds* has any application to the instant case, the United States satisfied its obligation under the sixth amendment when it offered defendant the assistance of counsel which he declined."); *see also Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) ("In fact, *Faretta* [*v. California*, 422 U.S. 806 (1975)] says nothing about any specific legal aid that the State owes a *pro se* criminal defendant.").

To the extent that the plaintiff believes that he was unprepared for the trial resulting in his convictions for grand larceny, kidnapping, and first-degree criminal sexual conduct, any civil rights claims relating to his convictions and sentences, including the claim under *Batson v. Kentucky*, 476 U.S. 79 (1986) [raised at doc. 1 ¶ 182], are barred by the holding in *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), because a right of action has not accrued.  The holding in *Heck* precludes the plaintiff's claims against all defendants in this case with respect to his criminal case. *Mills v. Greenville County.*, 586 F. Supp. 2d 480, 489–90 (D.S.C. 2008).  With respect to his convictions and sentences, the plaintiff's sole federal remedy lies in habeas corpus after he has exhausted his state court remedies. *See Heck*, 512 U.S. at 481 (stating that "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or

speedier release, even though such a claim may come within the literal terms of § 1983"). In any event, exhibits appended to the defendants' motion for summary judgment indicate that the plaintiff was provided copies of cases, statutes, and other legal materials (doc. 85-9 at 92–94).

Additionally, the defendants in this case do not have authority or control over the Circuit Court (Court of General Sessions) for Oconee County, which is part of the State of South Carolina's unified judicial system. *See* S.C. Const. art. V, § 1 ("The judicial power shall be vested in a unified judicial system, which shall include a Supreme Court, a Court of Appeals, a Circuit Court, and such other courts of uniform jurisdiction as may be provided for by general law."); and *City of Pickens v. Schmitz*, 376 S.E.2d 271, 272 (S.C. 1989). Under Article V, the Supreme Court of South Carolina retains the *sole* authority to supervise magistrates' courts, municipal courts, and the Circuit Court in Oconee County. *See Spartanburg Cnty. Dep't of Soc. Servs. v. Padgett*, 370 S.E.2d 872, 875–76 & n. 1 (S.C. 1988). Similarly, the defendants are not responsible for the actions of the Tenth Circuit Solicitor in the plaintiff's criminal case because they do not hire or supervise the Solicitor. *Anders v. Cnty. Council for Richland Cnty.*, 325 S.E.2d 538, 539–40 (S.C. 1985).

Based upon the foregoing, summary judgment is appropriate as to these claims.

### *Qualified Immunity*

The individual defendants also are entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, qualified immunity is lost if an official violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the alleged violation such that an objectively reasonable official in the official's position would have known of the right. *Id.*

19

To determine whether qualified immunity applies, a district court must determine a plaintiff has alleged the deprivation of an actual constitutional right at all and whether the particular right was clearly established at the time of the alleged violation. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, as discussed above, the plaintiff's allegations fail to demonstrate that the individual defendants violated his constitutional rights.  Therefore, the undersigned finds the individual defendants are entitled to qualified immunity.

### *Oconee County*

Oconee County is a local government entity that may be sued under Section 1983, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979), but an alleged constitutional violation must be related to a "policy or custom" of the county. *See Los Angeles Cnty. v. Humphries*, 131 S.Ct. 447 (2010); and *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  As discussed above, the plaintiff's constitutional rights have not been violated, but even assuming such a violation, no policies or customs of Oconee County were responsible because the Sheriff of Oconee County, not Oconee County, operates the OCDC  *See* S.C. Code Ann. § 24-5-10 (Westlaw 2014).

A county in South Carolina is not responsible for actions of a sheriff or deputy sheriff. *See Edwards v. Lexington Cnty. Sheriff's Dep't*, 688 S.E.2d 125, 127 n. 1 (S.C. 2010) ("However, under South Carolina law, the sheriff and sheriff's deputies are State, not county, employees."); and *Allen v. Fid. and Deposit Co.*, 515 F. Supp. 1185, 1189–91 (D.S.C. 1981) (County cannot be held liable for actions of deputy sheriff because deputy sheriffs in South Carolina serve at pleasure of the Sheriff, not the County), *aff'd*, 694 F.2d 716 (4th Cir. 1982) [Table].

***SCDC Policy/District Court Policy on Copies***

In his response to the motion for summary judgment (doc. 91 at 37–42), the plaintiff complains about the SCDC policy on copies and also implicitly complains about this court's denial, by order, of his motions to compel the SCDC to provide him with copies of pleadings in this case (*see* docs. 53, 59). These are new matters that were not raised in the complaint and cannot be raised in a response to motion for summary judgment. *White v. Roche Biomedical Labs., Inc.*, 807 F. Supp. 1212, 1216 (D.S.C. 1992) (noting that "a party is generally not permitted to raise a new claim in response to a motion for summary judgment").

As to this court's policy on photocopies of court documents, the plaintiff's *in forma pauperis* status applies only to the filing fee for the particular case. As a result, the plaintiff is not entitled to free photocopies from this court of documents filed in his prior cases or pending cases, including the above-captioned case. *See*, *e.g.*, *Tyson v. Jordan*, C.A. No. 6:10-1528-MBS-KFM, 2010 WL 3257840, at *2 (D.S.C. July 12, 2010) (indigent *pro se* litigants not entitled to copies, subpoenas, transportation, or deposition transcripts at government expense), *adopted by* 2010 WL 3257861 (D.S.C. Aug. 16, 2010).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment (doc. 85) be granted.

s/ Kevin F. McDonald
United States Magistrate Judge

May 22, 2014
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).